IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
VALDOSTA DIVISION

| | |
|---|---|
| CAROLYN HALL, Administrator of the Estate of WALTER WAYNE PETERSON, Deceased,<br><br>    Plaintiff,<br><br>v.<br><br>OFFICER ERIC FRIES, Individually and In His Official Capacity; SGT. SHAWN BOSTICK, Individually and In His Official Capacity; THE CITY OF MOULTRIE; CHIEF FRANK LANG, Individually and In His Official Capacity; COLQUITT COUNTY, GEORGIA; AND SHERIFF AL WHITTINGTON, Individually and In His Official Capacity,<br><br>    Defendants. | Civil Action No. 7:13-CV-105 (HL) |

**ORDER**

Before the Court are the Motion to Dismiss Plaintiff's Complaint by Defendants Shawn Bostick, Timmy J. Barnes, Colquitt County Sheriff's Department, and Sheriff Al Whittington (Doc. 21) and the Motion to Dismiss Plaintiff's First Amended Complaint by Defendants Shawn Bostick, Colquitt County, and Sheriff Al Whittington[1] (Doc. 38). For the reasons stated below, the

---

[1] Defendants Bostick and Whittington only move for the dismissal of the claims brought against them in their official capacities. For ease of reference, when used in this Order,

Motion to Dismiss Plaintiff's First Amended Complaint (Doc. 38) is granted and the Motion to Dismiss the Complaint (Doc. 21) is found to be moot.

A brief review of this litigation will clarify the record. After the motion to dismiss the original complaint was filed, Plaintiff Carolyn Hall ("Plaintiff"), as administrator of the estate of Walter Wayne Peterson, deceased, amended the complaint to add the City of Moultrie and Colquitt County as defendants to the action and include state-law claims of negligence and battery as well as a survival action claim. Plaintiff also stipulated to the dismissal of Defendants Timmy Barnes, Daniel Lindsay, the Moultrie Police Department, and the Colquitt County Sheriff's Department. Since Defendants Shawn Bostick and Al Whittington have renewed their motion to dismiss for the amended complaint, the motion to dismiss the original complaint is now moot, and the amended complaint (Doc. 32) will control in this action.

## I. Motion to Dismiss Standard

To avoid dismissal under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). A claim is plausible

---

"Defendants" will refer to Colquitt County, Shawn Bostick in his official capacity, and Sheriff Al Whittington in his official capacity.

if its factual allegations allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. The plausibility standard "calls for enough fact to raise a reasonable expectation that discovery will reveal evidence" of the defendant's liability. Twombly, 550 U.S. at 556.

In ruling on a motion to dismiss, the court must accept "all well-pleaded facts…as true, and the reasonable inferences therefrom are construed in the light most favorable to the plaintiff." Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1273 n. 1 (11th Cir. 1999). However, this tenet does not apply to legal conclusions in the complaint. Iqbal, 556 U.S. at 679. A court must dismiss the complaint if, "on the basis of a dispositive issue of law, no construction of the factual allegations will support the cause of action." Marshall Cnty. Bd. of Educ. v. Marshall Cnty. Gas Dist., 992 F.2d 1171, 1174 (11th Cir. 1993) (citing Executive 100, Inc. v. Martin County, 992 F.2d 1536, 1539 (11th Cir. 1991) and Bell v. Hood, 327 U.S. 678, 682, 66 S.Ct. 773, 90 L.Ed.2d 939 (1946)). "[C]onclusory allegations, unwarranted deductions of fact, or legal conclusions masquerading as facts will not prevent dismissal." Oxford Asset Mgmt., Ltd. v. Jaharis, 297 F.3d 1182, 1188 (11th Cir. 2002). The court may not "accept as true a legal conclusion couched as a factual allegation." Twombly, 550 U.S. at 555.

## II. Factual Background

Construing the complaint's factual allegations in favor of Plaintiff, this case arises from the fatal shooting of Walter Peterson ("Peterson") on September 5, 2011, by a special weapons and tactics ("SWAT") team comprised of officers from the City of Moultrie Police Department ("MPD") and the Colquitt County Sheriff's Department ("CCSD"). During the events at issue in this lawsuit, the SWAT team was operated as a joint venture of the MPD and the CCSD. Defendant Eric Fries ("Fries") was an officer with the MPD and a member of the SWAT team. Defendant Shawn Bostick ("Bostick") was a deputy sheriff with the CCSD and commanded the SWAT team on the day of Peterson's death. Defendant Al Whittington ("Whittington") was the Colquitt County sheriff. (First Amended Complaint, Doc. 32, ¶¶7-11).

On September 5, an employee of the "Best Little Store in Georgia" in Moultrie reported to the MPD that a man believed to be Peterson had thrown a brick through the store window. A witness who reportedly saw the event followed Peterson to his home. After Peterson used a butcher knife to threaten the MPD officer investigating the incident, the full SWAT response team, including Fries and Bostick, was called to Peterson's house. (Id. at ¶¶15-19, 25).

A stand-off developed and lasted for approximately two hours. Although both family members and a personal acquaintance offered to intercede with

Peterson, Fries refused their assistance even though Defendants knew Peterson was a paranoid schizophrenic who had not taken his medications for two years. Bostick shut off the house's electricity and ordered the SWAT team to attempt entry through the front door. Despite tasering Peterson, the officers could not get into the house. (Id. at ¶¶19-26, 37).

Following Bostick's directions, Fries then led a group of SWAT officers in an attempt to enter the house through the back door. If force was needed to immobilize Peterson, Fries was told to use a taser rather than his gun. The SWAT team was able to enter the house but encountered Peterson who was wielding a butcher knife. Without warning Peterson, Fries shot him four times with a gun, knocking him to the floor. As Peterson was lying on the floor bleeding, he was tasered twice at Bostick's instructions. Peterson subsequently died from his injuries. (Id. at ¶¶27-34, 50).

The inadequate training and education of the SWAT team contributed to Peterson's death. Neither the MPD, CCSD, nor Whittington provided policies and procedures for de-escalation techniques and use of force with mentally-ill individuals. This same lack of preparation and training had led the MPD to kill two other mentally-ill men in the late 1990s and 2006, respectively. (Id. at ¶¶42, 47, 64-67, 72-74).

### III. Discussion

Plaintiff has brought a claim under 42 U.S.C. § 1983 for the deprivation of Peterson's constitutional rights, as well as state law claims for negligence, battery, wrongful death, and survival action damages. Colquitt County moves to dismiss all claims against it, and Bostick and Whittington seek the dismissal of all claims against them in their official capacities.

#### A. Plaintiff's § 1983 claim against Colquitt County

The motion to dismiss the § 1983 claim against Colquitt County is granted because Plaintiff has failed to state a claim upon which relief may be granted. Plaintiff contends Colquitt County is liable for failing to create any policies or procedures or to provide any training for the SWAT team on how to deal with mentally-ill individuals who barricade themselves. These failures allegedly led to excessive force being used against Peterson in violation of the Fourth and Fourteenth Amendments to the United States Constitution. (Doc. 32, ¶¶1, 64-85).

Recognizing that "a municipality cannot be held liable under 42 U.S.C. § 1983 on a *respondeat superior* theory," Monell v. Department of Social Services of City of New York, 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), Plaintiff seeks to impose liability on Colquitt County under a customs or practice theory. Plaintiff does not allege that the county had an official policy sanctioning excessive force by the SWAT team but rather that the county had a custom of

tolerating unconstitutional actions. Plaintiff alleges the killing of two other mentally-ill men by MPD officers, in the late 1990s and 2006 respectively, put Colquitt County on notice of the need for law enforcement policies for such individuals and that the failure to create such policies was a constitutional violation. (Doc. 32, ¶¶64-82).

Plaintiff's customs or practice theory fails to state a claim for the county's liability. "[T]o impose § 1983 liability on a municipality, a plaintiff must show: (1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation." McDowell v. Brown, 392 F.3d 1283, 1289 (11th Cir. 2004). "Because municipalities rarely have an official policy that endorses a constitutional violation," a plaintiff "must show that [the defendant] had a custom or practice of permitting it and that [the defendant's] custom or practice was the moving force behind the constitutional violation." Craig v. Floyd County, Georgia, 643 F.3d 1306, 1310 (11th Cir. 2011) (quoting Grech v. Clayton County, Georgia, 335 F.3d 1326, 1330 (11th Cir. 2003) (internal punctuation and quotation removed). For a municipality to be liable there must ordinarily be a "pattern of similar constitutional violations." Id. (quoting Connick v. Thompson, 563 U.S. ____, 105 S.Ct. 1350, 1360, 179 L.Ed.2d 417 (2011)). There "must be such a 'longstanding and widespread practice [that the violation]

is deemed authorized by the policymaking officials because they must have known about it but failed to stop it.'" Id. (quoting Brown v. City of Fort Lauderdale, 923 F.2d 1474, 1481 (11th Cir. 1991)).

Even assuming that Colquitt County was the policymaking authority for the SWAT team,[2] Plaintiff has not alleged a custom or practice by the county of neglecting to correct unconstitutional treatment of mentally-ill individuals. The Court is far from convinced that two deaths in more than fifteen years would rise to the level of a pattern or practice. See Hawk v. Klaetsch, 522 F. App'x 733, 735 (11th Cir. 2013) (concluding that three prior incidents over five years did not "constitute frequent, widespread, or rampant abuse"). Even if the deaths had established a pattern or practice, there would be no basis for imposing on Colquitt County a duty to correct the problems leading to the earlier deaths. Officers with the MPD, not the SWAT team, were responsible for the two prior deaths. "In the absence of a series of constitutional violations from which deliberate indifference can be inferred, the plaintiff[ ] must show that the policy itself is unconstitutional." Craig, 643 F.3d at 1311 (quoting Estate of Novack ex rel. Turbin v. Cnty. of Wood, 226 F.3d 525, 531 (7th Cir. 2000). The Court is not

---

[2] Colquitt County was clearly not the policymaking authority for the deputy sheriffs serving on the SWAT team. Grech, 335 F.3d at 1336. Defendants have not questioned whether the county had the legal authority to train or to set the policies for the MPD officers on the SWAT team, and for purposes of this Order the Court must construe the factual allegations in favor of the Plaintiff and assume that the county did actually exercise such authority.

prepared to impute "deliberate indifference" to Colquitt County based on actions taken by police officers the county did not employ or control. The § 1983 claim against Colquitt County is dismissed.

### B.     Plaintiff's § 1983 claim against Sheriff Whittington

Because Sheriff Whittington is entitled to Eleventh Amendment immunity, the motion to dismiss the § 1983 claim against him in his official capacity is granted. The Eleventh Amendment provides immunity to state officials or those functioning as an "arm of the state" from being sued in their official capacity in federal court. Manders v. Lee, 338 F.3d 1304, 1308 (11th Cir. 2003). "Whether a defendant is an 'arm of the state' must be assessed in light of the particular function in which the defendant was engaged when taking the actions out of which liability is asserted to arise." Id. In Manders the Eleventh Circuit set out four factors to assess a defendant's function: "(1) how state law defines the entity; (2) what degree of control the State maintains over the entity; (3) where the entity derives its funds; and (4) who is responsible for judgments against the entity." Id. at 1309. The entity in question here is the Colquitt County sheriff's office since the SWAT team has no independent legal standing, and it is only as the county sheriff that Whittington is connected to Peterson's death.

The first factor weighs in favor of Sheriff Whittington's immunity because the State of Georgia defines county sheriffs as arms of the state for law

enforcement purposes. Although the facts in Manders involved the use-of-force policy in a county jail, the Eleventh Circuit left no doubt as to how the state generally defines sheriffs' law enforcement functions. Id. at 1319 (noting that "location alone does not control" the immunity analysis). "What duties the State assigns sheriffs is indicia of how the State defines that entity." Id. at 1312. The state tasks county sheriffs with the common law duties of enforcing the laws and preserving the peace. Id. at 1312. The "authority to use force or the tools of violence," as well as the duty to provide training and use of force policies for deputy sheriffs, is "directly derived from the State," not the county. Id. at 1319. Whittington's authority to use force against Peterson came from his duty to provide services for the State of Georgia, as did the requirement to train his deputies and provide them with use of force policies. Alleging that the deputy sheriffs were participating on a joint city-county SWAT team elides the fact that Georgia law defines the sheriff and his deputies as state actors when functioning as law enforcement officers. Id.

The second factor also lies heavily in favor of immunity because the state maintains a high degree of control over Whittington's office. The state rather than Colquitt County possesses "the exclusive authority to establish and to control a sheriff's powers and duties." Id. at 1310. The state requires annual law enforcement training for sheriffs, provides funds for the training, and disciplines

any sheriff who forgoes the training. Id. at 1320. The Georgia governor's office investigates and punishes any misconduct by a sheriff, including policies permitting excessive force. Id. at 1321. Conversely, counties do not have any authority to create or control the use of force policies for a sheriff's office. Id. at 1322. Tellingly, Plaintiff has not alleged that Colquitt County instituted or oversaw the use of force policies employed by deputy sheriffs on the SWAT team with regards to mentally-ill individuals. Instead, the complaint alleges that Colquitt County is liable because it did not create such policies when it should have done so. (Doc. 32, ¶¶9, 64-67). The Court need not construe this legal assertion in Plaintiff's favor in contradiction to the Eleventh Circuit's clear interpretation of Georgia law. *See* Jaharis, 297 F.3d at 1188.

The third factor concerns where Sheriff Whittington's office derives its funds, and this factor tilts in favor of his immunity. Manders, 338 F.3d at 1323. While Colquitt County may very well supply the greatest funding source for the CCSD, "it is because the State so mandates." Id. Georgia statutes set the salaries that the county must pay to Whittington and his deputies. State law requires Colquitt County to provide Whittington with sufficient funds to enable him to fulfill his legal duties, and it may not dictate how he expends those funds. *See* id. at 1323-24. Moreover, state coffers fund the sheriff's law enforcement training as well as any investigation of and punishment for misconduct in his office. Id. at

1323. Plaintiff has not alleged that the county funded the SWAT team in a manner that would somehow expand the county's powers beyond the restrictions set by state law so that it could lawfully dictate how Sheriff Whittington used his budget or created law enforcement policy. Indisputably, Sheriff Whittington's deputies were engaged in law enforcement here, so the Court fails to see how the analysis in Manders would not equally apply in this case.

Turning to the fourth factor of what source would be required to pay for any judgment against Sheriff Whittington in his official capacity, the Court concludes that this factor does not destroy his immunity. Georgia counties are not legally obligated to pay damage awards against sheriffs, for a sheriff would have to pay the damages out of his own budget, and then most likely turn, hat in hand, to both the state and the county to re-supply the budgetary funds. *See* id. at 1326-28. Thus, as a practical matter, both the State of Georgia and Colquitt County would be likely to pay any damage award against Sheriff Whittington. The Eleventh Circuit has consequently concluded that a state's immunity from suit "is not limited to who foots the bill, and, at a minimum, the liability-for-adverse-judgment factor does not defeat [a sheriff]'s immunity claim." Id. at 1328.

The balance of these factors weighs heavily in favor of Sheriff Whittington's immunity. The Court finds that Sheriff Whittington served as an arm of the state during the events described in the complaint and is entitled to

Eleventh Amendment immunity.[3] Therefore, the motion to dismiss the § 1983 claim against him in his official capacity is granted.

### C.     Plaintiff's § 1983 claim against Deputy Sheriff Bostick

Defendant Bostick is also entitled to Eleventh Amendment immunity for the § 1983 claim against him in his official capacity. Although "the Eleventh Circuit has not confirmed that deputy sheriffs in Georgia are immune from suit under Eleventh Amendment principles, a line of district court cases has 'determined that when a sheriff is acting as an arm of the state, his deputies are also entitled to Eleventh Amendment Immunity.'" Lewis v. Wilcox, No. 3:06-CV-29, 2007 WL 3102189, at *9 (M.D.Ga. Oct. 23, 2007) (quoting Gates v. Jolley, No. 4:06-CV-50, 2007 WL 106533 (M.D.Ga. Jan. 8, 2007)); see also Carr v. City of Florence, Alabama, 916 F.2d 1521, 1527 (11th Cir. 1990) (recognizing Eleventh Amendment immunity for deputy sheriffs in Alabama). Without reviewing each of the factors from Manders v. Lee in detail, the Court finds that Bostick served as an arm of the State of Georgia during the events described in the complaint. His

---

[3] Such a result is in keeping with how sister courts have applied the factors from Manders v. Lee to sheriffs' law enforcement activities outside of a jail context. See, e.g., Townsend v. Coffee County, Georgia, 854 F. Supp. 2d 1345, 1352 (S.D.Ga. Aug. 9, 2011) (finding the sheriff's office was entitled to Eleventh Amendment immunity for law enforcement activity that allegedly violated, inter alia, the Fourth Amendment); Lewis v. Wilcox, No. 3:06-CV-29, 2007 WL 3102189, at *9 (M.D.Ga. Oct. 23, 2007) (finding that immunity protected the deputy sheriff against a claim of excessive force with the implementation of a roadblock); Scott v. Mercier, CV506-33, 2007 WL 2728440, at *3-4 (S.D.Ga. Sept. 14, 2007) (determining a deputy sheriff had immunity in a case involving allegedly excessive use of force while retrieving children involved in a custody dispute).

participation in the SWAT raid on Peterson's house was a law enforcement function that was lawful only because of the authority granted by the state to the Colquitt County sheriff's office. Therefore, the motion to dismiss the official capacity claim is granted.

### D. Plaintiff's state law claims against Defendants

The motion to dismiss the state law claims against Defendants is granted. Under Georgia law, Defendants are entitled to immunity against state law claims, as Plaintiff appears to concede.[4] *See* Russell v. Barrett, 296 Ga. App. 114, 673 S.E.2d 623, 628-29 (2009) (recognizing immunity against claims for negligence; failure to train, instruct, and supervise; assault and battery; and *respondeat superior*); Woodard v. Laurens County, 265 Ga. 404, 456 S.E.2d 581, 582-83 (1995) (involving claims of negligent inspection and maintenance of a stop sign).

## IV. Conclusion

Based on the fore-going reasons, the Motion to Dismiss Plaintiff's First Amended Complaint (Doc. 38) is granted. Therefore, the following is ordered in this case:

1. All of the claims against Colquitt County are dismissed;

---

[4] In responding to the motion to dismiss, Plaintiff agreed that sovereign immunity protected Defendants from "her state law negligence claims" and dismissed them, although she did not otherwise address Defendants' motion to dismiss *all* of the state law claims. (Brief in Opposition to the Motion to Dismiss, Doc. 40, p. 20).

2. All of the claims against Sheriff Al Whittington in his official capacity are dismissed;

3. All of the claims against Shawn Bostick in his official capacity are dismissed;

4. The clerk of court is ordered to amend the caption in this case to reflect these changes;

5. Plaintiff may move forward with the remaining claims; and

6. The stay of discovery in this case is lifted, and a new scheduling order will be entered.

**SO ORDERED**, this the 9th day of April, 2014.

*s/ Hugh Lawson*
**HUGH LAWSON, SENIOR JUDGE**

scr