**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**VALDOSTA DIVISION**

| | |
|---|---|
| **CAROLYN HALL, Administrator of the Estate of WALTER WAYNE PETERSON, Deceased,** | |
| Plaintiff, | Civil Action No. 7:13-CV-105 (HL) |
| v. | |
| **OFFICER ERIC FRIES, Individually and In His Official Capacity; SGT. SHAWN BOSTICK, Individually; THE CITY OF MOULTRIE; CHIEF FRANK LANG, Individually and In His Official Capacity; AND SHERIFF AL WHITTINGTON, Individually,** | |
| Defendants. | |

## ORDER

Before the Court are the Motion to Exclude Plaintiff's Expert (Doc. 60) by Defendants Officer Eric Fries, individually and in his official capacity, the City of Moultrie, and Chief Frank Lang, individually and in his official capacity (collectively "Moultrie Defendants"); the Motion to Exclude Plaintiff's Expert (Doc. 61) by Defendants Sgt. Shawn Bostick ("Bostick") and Sheriff Al Whittington ("Whittington")[1]; Bostick and Whittington's Motion for Summary Judgment (Doc. 85); the Moultrie Defendants' Motion for Summary Judgment (Doc. 89); and

---

[1] As used in this order, "Defendants" refers to Eric Fries, in his individual and official capacities; Frank Lang, in his individual and official capacities; the City of Moultrie; Bostick, in his individual capacity; and Whittington, in his individual capacity.

Plaintiff's Motion for Leave to Amend Her Complaint (Doc. 115). For the reasons provided below, the motions to exclude Plaintiff's expert are granted in part and denied in part, the motions for summary judgment are granted, and the motion for leave to amend the complaint is denied.

## I.    Factual Summary[2]

This case centers on the allegedly unreasonable use of force by Defendants in violation of the Fourth Amendment. On September 5, 2011, a clerk at the Best Little Store in Georgia reported to the Moultrie Police Department ("MPD") that someone he thought was Walter Wayne Peterson ("Peterson") had thrown a brick through the store's front window. After hearing a dispatch about the incident, MPD Officer Lamar McKnight ("McKnight") visited the Best Little Store in Georgia and learned from a witness that the person who had thrown the brick had run down the street and entered a house. (Moultrie Defendants' Statement of Material Facts ("Moultrie's SMF"), Doc. 91, ¶¶1–3).

McKnight went to the house and, standing at the front door knocking, heard noises indicating that the individual inside the house had gone to its rear. McKnight walked to the back door and found it ajar. (Id. at ¶¶6–7). Suddenly, Peterson slammed the door shut so forcefully that McKnight thought Peterson

---

[2] In accordance with Federal Rule of Civil Procedure 56 and Middle District of Georgia Local Rule 56, the factual summary is taken from those portions of Defendants' Statements of Material Facts (Docs. 85-2, 91) that are undisputed by Plaintiff and from Plaintiff's Statement of Material Facts (Doc. 117). The Court has also drawn non-material facts from the record generally to clarify and streamline the narrative.

must have rammed his shoulder into the door. Then, through the closed door, McKnight heard Peterson say "these motherfuckers owe me money." Sounds from inside the house suggested Peterson was moving back toward the front door. (Bostick and Whittington's Statement of Material Facts ("Bostick/Whittington's SMF"), Doc. 85-2, ¶¶9–11). By this point, a second MPD officer, Rowell Leao, had come to the house. (Deposition of Lamar McKnight, Doc. 105, p. 38). Asking Leao to watch the rear door, McKnight returned to the front of the house. (Bostick/Whittington's SMF, ¶12).

When McKnight knocked on the front door, he heard what sounded like someone running toward the door. Suddenly the door swung open, and Peterson appeared holding a knife in his right hand. McKnight perceived Peterson's actions as being "very aggressive." The officer felt threatened, drew his weapon, and backed away from the door. In McKnight's haste to create distance between himself and Peterson, he stumbled and fell off the house's porch, landing in some bushes. Peterson then slammed the door shut. (Id. at ¶¶13–17). As McKnight was later to learn, Peterson suffered from paranoid schizophrenia. (Plaintiff's Statement of Material Facts ("Plaintiff's SMF"), Doc. 117, ¶15).

Other law enforcement officers arrived on the scene during this time, including Robert Rodriguez ("Rodriguez"), who was an officer with the MPD. McKnight described to Rodriguez what had taken place, and Rodriguez called his

supervisor, who instructed him to summon the MPD's special weapons and tactical ("SWAT") team. (Bostick/Whittington's SMF, ¶¶18–19; Deposition of Robert Rodriguez, Doc. 106, pp. 25–26). The SWAT team is composed of law enforcement officers from both the MPD and the Colquitt County Sheriff's Department ("CCSD"). Eric Fries ("Fries"), a MPD officer and member of the SWAT team, was called to the house and relayed the request for the SWAT team to Shawn Bostick, who was the team's commander and a deputy sheriff with the CCSD. After Bostick arrived on the scene, he was informed that Peterson had broken the store window, gone into a house, and with a knife assaulted McKnight when the officer attempted to investigate the property damage. (Bostick/Whittington's SMF, ¶¶22–26). At some point in time, an officer with the CCSD swore out an arrest warrant on Peterson for aggravated assault against McKnight.[3] (Plaintiff's SMF, ¶10).

Bostick assumed command of the area surrounding the house where Peterson was secured. Both before and after Bostick's arrival, a trained crisis negotiator on the SWAT team sought to communicate with Peterson via the public address system attached to the negotiator's patrol car. Peterson never responded to the negotiator. Hearing about the situation, Reginald Green ("Green") came to the house. As a supportive employment supervisor at the

---

[3] In their statements of material facts, the parties have not laid out the chain of communications that led to the CCSD officer's seeking and obtaining the warrant.

Colquitt County Mental Health Department, Green had worked with Peterson for over fourteen years. The SWAT team allowed Green to use a bullhorn for several minutes in an attempt to open a dialogue with Peterson, but there was no response from inside the house. In total, the efforts to communicate with Peterson lasted for more than two hours, without success. (Moultrie's SMF, ¶¶23, 27–36). During this time, the SWAT team learned of Peterson's mental health issues. (Plaintiff's SMF, ¶15).

After these failures to encourage Peterson to communicate with law enforcement, Bostick decided to try other means. Bostick ordered a throw phone, a two-way communication device,[4] to be placed on the house's front porch in the hope that Peterson would take the phone inside the house where he would feel more comfortable communicating with the SWAT team. The thrown phone was placed within two feet of the house's front door. Using the public address system on the patrol car, the officers informed Peterson that the phone was outside the door. He did not respond or retrieve the phone. Hoping that uncomfortable conditions inside the house would induce Peterson to use the phone, Bostick ordered the electrical power line to the house to be cut. This step elicited no response from Peterson. (Moultrie's SMF, ¶¶37–41).

---

[4] "A 'throw phone' is a phone encased in a box that also contains an open microphone." Fisher v. City of San Jose, 558 F.3d 1069, 1073 n. 3 (9th Cir. 2009).

Bostick decided to have the SWAT team breach the front door and toss the phone inside the house. Six SWAT team members lined up in a "stack" outside the front door. Tom Mothershed ("Mothershed") served as the point man in the stack and was equipped with a shield and a Taser. The SWAT team forced the door open with a battering ram, and almost immediately, Mothershed saw Peterson coming toward the door with a knife in his right hand. Mothershed shouted that Peterson had a knife and then discharged his Taser. It appeared to Mothershed that Peterson continued toward the front door, which slammed shut. The officer immediately attempted to open the door, but he could not do so, leading him to think that Peterson was either lying against the door, having been immobilized by the Taser, or pushing on it to prevent the officers from entering the house. (Id. at ¶¶42–47, 49–51).

Watching the commotion on the front porch from a distance, and observing Mothershed deploy the Taser, Bostick thought there was an opportunity for the SWAT team to enter the house by the back door while Peterson was, so Bostick believed, incapacitated near the front door.[5] Running to the rear of the house to a

---

[5] Plaintiff sharply disputes that Bostick could have reasonably believed that Mothershed had been successful in tasing Peterson. As later events would reveal, Peterson had not been tased. However, Plaintiff has not pointed the Court to evidence that would contest Bostick's subjective perceptions. Given Bostick's vantage point, it was reasonable for him to think Plaintiff had been tased. Plaintiff has not met the burden set by Local Rule 56 for actually disputing this fact. Indeed, throughout her responses to Defendants' statements of material facts, Plaintiff repeatedly purports to dispute some fact without providing any evidence to do so.

group of officers waiting by the back door, Bostick ordered them to enter the house while Peterson was still immobilized by the Taser. Eric Fries was one of the officers waiting by the back door. Leading the way into the house, Fries kicked open the rear door of the residence and entered a laundry and storage room that was too small to allow for many of the other officers to follow him into the room. Fries then encountered a bedroom door, which he was only able to breach after three kicks. (Id. at ¶¶52–56, 60–63).

With the last kick, the door opened, and Fries encountered Peterson. The man was standing approximately two to three feet in front of Fries and wielding a butcher knife that he was slashing at the officer in a downward, stabbing motion. Fries stepped backward, drew his firearm, and shot at Peterson three times, before falling backward and injuring his head. A subsequent test for gunshot residue on Peterson indicated that he was no closer than three to five feet from Fries when the shots were fired. After Fries fired at Peterson, the suspect turned and ran into the interior of the house. (Id. at ¶¶64–70, 76–77). Members of the SWAT team followed Peterson toward the front of the house where they found him lying on the ground near a set of drums by the front door with his back toward the officers. One of the officers told Bostick that Peterson still had the knife. Because Peterson had not yet been taken into custody and appeared to be getting up from the floor, Bostick ordered him to be tased twice. Shortly

thereafter, discovering that Peterson had been shot, Bostick told the paramedics to provide medical treatment, but, despite their efforts, Peterson died soon afterwards from his gunshot wounds. (Bostick/Whittington's SMF, ¶¶88–90).

Plaintiff Carolyn Hall ("Plaintiff"), as the administrator of Peterson's estate, filed suit in this Court on July 31, 2013. (Complaint, Doc. 1). Defendants have been added and removed from the lawsuit through the stipulated dismissal of certain defendants (Stipulation of Dismissal, Doc. 35), Plaintiff's amendment of her complaint (First Amended Complaint, Doc. 32), and this Court's dismissal of other defendants (Order, Doc. 45). The remaining defendants are the City of Moultrie; Eric Fries, individually and in his official capacity as a police officer; Frank Lang, individually and in his official capacity as chief of the MPD; Shawn Bostick in his individual capacity; and Colquitt County Sheriff Al Whittington in his individual capacity.

Plaintiff has brought a variety of federal and state claims. The first claim, pursuant to 42 U.S.C. § 1983, is that Defendants violated Peterson's rights under the Fourth and Fourteenth Amendments to the United States Constitution by an unreasonable use of excessive force against him.[6] According to Plaintiff, Fries acted unreasonably in shooting Peterson instead of using a less forceful means to stop him. Bostick violated Peterson's constitutional rights in how he supervised

---

[6] The Supreme Court has directed that an excessive-force claim should be analyzed under the Fourth Amendment and its "reasonableness" standard, not the Fourteenth Amendment's Due Process Clause. Graham v. Connor, 490 U.S. 386, 395 (1989).

the SWAT team and by ordering Peterson to be tased even after the suspect had been shot by Fries. The City of Moultrie, Chief Lang, and Sheriff Whittington are allegedly liable under § 1983 because they failed to implement policies, customs, procedures, or training that would have prepared the SWAT team in how to handle suspects known to be suffering from paranoid schizophrenia, particularly when the suspects are barricaded inside a house. Prior to Peterson's death, two other mentally-ill men had been shot and killed by MPD officers in the late 1990s and 2006. Moreover, the city, police chief, and sheriff ratified the actions of the SWAT team by failing to investigate or punish its members who had been involved in Peterson's death or the prior shootings. The Defendants also face state-law claims for negligence, battery, wrongful death, a survival action, and violations of the Georgia Constitution, while seeking attorney fees pursuant to 42 U.S.C. § 1988. (First Amended Complaint, ¶¶1, 35–97).

## II.   Defendants' Motions to Exclude Plaintiff's Expert

The motions to exclude some of the opinions of Plaintiff's expert Joseph Burton ("Burton") are granted in part and denied in part. Defendants contend that certain opinions must be excluded because they were not disclosed within the time set by this Court's scheduling order, pursuant to Federal Rule of Civil Procedure 26, and they do not meet the standard set by Federal Rule of

Evidence 702 and the Supreme Court in <u>Daubert v. Merrell Dow</u> <u>Pharmaceuticals</u>, 509 U.S. 579 (1993).

Hired by Plaintiff as a forensic pathologist, Burton offered three opinions in his deposition that have elicited objections from Defendants. First, Burton stated that it was possible, although not probable, that in seven seconds Peterson would have been able to go from the front door of the house to the rear where he confronted Fries and then back to the front door. Nor was it probable, even if possible, for Peterson to get from his confrontation with Fries back to the front room in three seconds. Second, Burton did not think that Peterson would have been able to continue holding the knife in his right hand after being shot by Fries and tased by the other officers. Third, the pathologist offered opinions about the various positions Peterson and Fries could have been in at the time of the shooting that would account for the trajectory of the bullets through Peterson's body. (Deposition of Joseph Burton, M.D., Doc. 70, pp. 15–18, 22–32).

### A.   Compliance with Rule 26

Only some of Burton's opinions must be excluded for Plaintiff's failing to comply with Rule 26. Under Rule 26(a)(2)(B), a party's disclosure of an expert whose testimony will be relied on must be accompanied by a written report containing "a complete statement of all opinions the witness will express and the basis and reasons for them," "the facts or data considered by the witness in

forming them," and "the witness's qualifications" to render those opinions. If the district court sets a deadline for expert disclosures, the expert must be disclosed by then. Rule 26(a)(2)(D). If a party fails to meet Rule 26's disclosure requirements, "the party is not allowed to use the information or witness to supply evidence on a motion … or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. Pro. 37(c)(1); see also Prieto v. Malgor, 361 F.3d 1313, 1317–18 (11th Cir. 2004). The non-disclosing party has the responsibility of showing that its actions were harmless or substantially justified. Stallworth v. E-Z Convenience Stores, 199 F.R.D. 366, 368 (M.D. Ala. 2001).

The deadline for Plaintiff to disclose any expert she wished to use was August 6, 2014, (Order, Doc. 52); the deadline for supplementing an expert's report was November 30, 2014 (Order, Doc. 57, p. 1). While Plaintiff disclosed Burton to Defendants and provided them with his report within the timeframe set by the Court's orders, she never supplemented that report. The beginning of Burton's report states that he had been "asked to determine the approximate muzzle to target distance for the gunshot wounds which resulted in the death of Mr. Peterson." (Burton Report, Doc. 60-1, p. 2). Burton concluded that when Fries's gun was discharged Peterson was more than five feet away from the gun's muzzle. The pathologist also opined on the trajectories of the bullets as they passed through Peterson. Finally, Burton described how getting shot "would

not have resulted in [Peterson's] instantaneous collapse or death," and the suspect could have remained mobile. (Id.)

In light of the opinions outlined in the report, some of the statements Burton made in his deposition were elaborations on the report while other remarks certainly constitute new opinions. On the one hand, Burton's report unambiguously addresses how physically mobile Peterson might have been after the shooting, so Burton's calculating whether Peterson could have covered some distance in a particular timeframe should not have been surprising, and certainly is not unfairly prejudicial, to Defendants. On the other hand, the report failed to notify Defendants that Burton would be offering opinions about Peterson's grip strength and whether the suspect could have continued grasping the knife in his right hand after getting shot and tased. Plaintiff has offered no plausible explanation for why the omission of this opinion from Burton's expert report is substantially justified, and it was certainly not harmless given that counsel for Defendants could not adequately prepare to depose Burton or seek a rebuttal expert opinion. See McClain v. Metabolife Int'l, Inc., 193 F. Supp. 2d 1252, 1259 (N.D. Ala. 2002) (observing that "merely having to depose a party on information that should have been disclosed in a Rule 26 Report is a form of prejudice").

Therefore, pursuant to Rule 37(c)(1), the opinion that Peterson would have been unable to continue holding a knife in his right hand is excluded.[7]

On the spectrum of opinions that were adequately disclosed in or omitted from Burton's expert report, his opinions concerning how Fries's and Peterson's bodies might have been positioned at the time of the shooting fall somewhere in the middle. The Court questions whether a reasonable party could have known from the report that Burton would be rendering these opinions, the reasons for his conclusions, the facts and data he considered, and his qualifications to provide the resulting opinions, as Rule 26 requires. However, because these opinions largely must be excluded under the Daubert standard, the Court will not consider whether they should also be excluded under Rule 37.

### B.     The Analysis of Burton's Opinions under Daubert and Rule 702

Few of the remaining disputed opinions from Burton survive Daubert scrutiny. A party wishing to have a witness testify as an expert bears the burden of laying, by a preponderance of the evidence, a foundation for the admission of its expert's testimony. McCorvey v. Baxter Healthcare Corp., 298 F.3d 1253, 1256 (11th Cir. 2002) (quoting Allison v. McGhan Med. Corp., 184 F.3d 1300,

---

[7] The Federal Rules of Evidence require the exclusion of this opinion. There is no evidence about what methodology Burton used to determine Peterson's ability to continue gripping the knife or if that methodology was scientifically reliable. See Fed. R. Evid. 702. Even were this opinion admissible and not excluded under Rule 37, it would not save Plaintiff's claims from summary judgment.

1306 (11th Cir. 1999)). Whether certain opinions may be offered as expert testimony is determined by the standard stated in Federal Rule of Evidence 702:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

As the Supreme Court clarified in <u>Daubert</u>, a trial court must act as a "gatekeeper" and test the reliability and relevancy of the proposed expert's opinions before determining whether they can be admitted as expert testimony. 509 U.S. at 589–93 The trial judge must undertake a "rigorous three-part inquiry" and decide whether: (1) a proposed expert is qualified to competently testify concerning his opinions; (2) his methodology is sufficiently reliable; and (3) his testimony would assist the jury, through the application of scientific, specialized, or technical expertise, to determine a fact in issue or understand the evidence. <u>United States v. Fazier</u>, 387 F.3d 1244, 1260 (11th Cir. 2004) (quoting <u>City of Tuscaloosa v. Harcros Chems., Inc.</u>, 158 F.3d 548, 562 (11th Cir. 1998)). The Supreme Court has provided a non-exclusive list of factors that may be considered in weighing the reliability of an expert's theory or methodology, including "(1) whether it can be (and has been) tested; (2) whether it has been

subjected to peer review and publication; (3) what its known or potential rate of error is, and whether standards controlling its operation exist; and (4) whether it is generally accepted in the field."[8] <u>United States v. Brown</u>, 415 F.3d 1257, 1267–68 (11th Cir. 2005) (citing <u>Daubert</u>, 509 U.S. at 593–94). The reliability test is flexible, and not all of the factors are applicable in every case. <u>Id.</u>

Defendants contend that Burton's opinions about how quickly Peterson could have moved certain distances and the positions of Fries's and Peterson's bodies must be excluded as unreliable and not helpful to a jury. With regard to the first opinion, the Court disagrees. Defendants focus their argument relating to the speed of Peterson's movements inside the house on the lack of evidence indicating precisely where Peterson was in the seconds before he confronted Fries in the back of the house and immediately after the shooting. While Plaintiff has yet to point to such evidence,[9] it is theoretically possible that she could do so at trial. Significantly, Defendants do not dispute Burton's general opinion about

---

[8] The Advisory Committee's Notes on Rule 702 provide additional factors, including (1) whether the expert is testifying based on research that was conducted independently of litigation, (2) whether she is "unjustifiably extrapolate[ing] from an accepted premise to an unfounded conclusion," (3) whether she has accounted for "obvious alternative explanations," (4) whether she is being as careful in reaching her opinions as a hired expert as she would for her professional work outside of litigation, and (5) whether her purported area of expertise "is known to reach reliable results for the type of opinion the expert would give." (2000 Amendments).

[9] Plaintiff has placed into the record a video recording from a cell phone held by a person standing outside the house during the SWAT team's stand-off with Peterson. The Court has reviewed the recording. Because Peterson is never seen in the video, the Court fails to see how it could serve as evidence of the suspect's precise location at a specific moment so as to make Burton's opinions relevant and useful.

Peterson's mobility. Thus, the Court is not willing, at this juncture, to foreclose Burton from testifying about how quickly Peterson could have moved certain distances, provided that the necessary predicate evidence is supplied. It is possible such testimony could be useful to assist a jury in constructing a timeline of events and assessing the credibility of witnesses.

However, the Court excludes Burton's opinions about how Fries and Peterson might have been positioned relative to each other in the moment the bullets that hit the suspect were discharged. As indicated above, Burton's report is silent about what, if any, specific methodology he used to reach these conclusions.[10] Burton related in his deposition that Fries's height would be a critical factor for determining how the officer was positioned when he shot the gun. Burton admitted he does not know how tall Fries is. (Burton Depo., p. 31). More importantly, Burton testified that the method for determining the position of the firearm relative to Peterson "is [to] get a dummy, which I've done before and put dowel rods in it for the bullet track and if the dowel rod is long enough, you can extend it out and you can show somewhere along the dowel rod length where the muzzle of the gun needed to be, how it needed to be pointed, at least."

---

[10] Stating, as the report does, that Burton followed the "Scientific Method of Analysis" is much too vague to reassure the Court that the pathologist employed techniques that are widely used in the scientific community.

(Id. at 31–32). There is no evidence that Burton used this approach in this case.[11]
Having no indication that Burton used any standard or scientifically-reliable
methodology, the Court must assign his opinions about Fries's and Peterson's
relative positions to the realm of guesswork and exclude them.[12]

## III.  Defendants' Motions for Summary Judgment

Defendants' motions for summary judgment are granted. Based on the
undisputed factual record, Defendants are entitled to judgment as a matter of law
on all of Plaintiff's claims.

### A.  Summary Judgment Standard

Summary judgment is appropriate when "the pleadings, the discovery and
disclosure materials on file, and any affidavits show there is no genuine issue as
to any material fact and … the moving party is entitled to a judgment as a matter
of law." Fed. R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322
(1986). A genuine issue of material fact arises only when "the evidence is such
that a reasonable jury could return a verdict for the nonmoving party."  Anderson

---

[11] Plaintiff has the burden of demonstrating that her proposed expert's opinions are
reliable, see McCorvey, 298 F.3d at 1256, and the Court thinks it significant that she did
not even attempt to place on the record an affidavit elaborating on Burton's
methodology once it was called into question.

[12] Given that Burton's opinion about how Peterson, and he alone, might have been
positioned when the bullets entered his body arises from the expert's study of the
bullets' trajectories in the body, this opinion is admitted. However, the fact that one of a
number of positions described by Burton involved Peterson lying on the ground when he
was shot does not create a genuine question of fact on whether Fries violated
Peterson's Fourth Amendment rights. Other possible positions described by the
pathologist perfectly accord with Defendants' description of the shooting.

v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The court must evaluate all of the evidence, together with any logical inferences, in the light most favorable to the nonmoving party. Id. at 254–55. The court may not, however, make credibility determinations or weigh the evidence. Id. at 255; see also Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000).

The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of a material fact." Celotex, 477 U.S. at 323 (internal quotation omitted). If the movant meets this burden, the burden shifts to the party opposing summary judgment to go beyond the pleadings and present specific evidence showing that there is a genuine issue of material fact, or that the movant is not entitled to judgment as a matter of law. Id. at 324–26. This evidence must consist of more than conclusory allegations. See Avirgan v. Hull, 932 F.2d 1572, 1577 (11th Cir. 1991). Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

### B.    Section 1983 Claims

Defendants are entitled to summary judgment on Plaintiff's § 1983 claims. Plaintiff has not shown that any of the Defendants violated Peterson's Fourth Amendment rights. Moreover, qualified immunity defeats the individual-capacity claims against Defendants.

### a.    Plaintiff's § 1983 Claim Against Fries

Summary judgment is granted on this claim because Fries's shooting of Peterson did not violate the Fourth Amendment. Furthermore, with regard to the claim against Fries in his individual capacity, he is entitled to qualified immunity.

### i.    Whether Fries violated the Fourth Amendment

The shooting of Peterson was not an unreasonable, excessive use of force in violation of the Fourth Amendment. A law enforcement officer's use of excessive force in making an arrest constitutes an unreasonable seizure in violation of the Fourth Amendment, even if there is probable cause for the arrest. See Graham v. Connor, 490 U.S. 386, 394 (1989). "Determining whether the force used … is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." Id. at 396 (internal citation, quotation, and punctuation omitted). "The 'reasonableness' of a particular use of force must be judged from the perspective

of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Id. This approach allows "for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." Id. at 396–97.

While paying "careful attention to the facts and circumstances of each particular case," courts should consider several factors when weighing the reasonableness of a particular use of force. Id. at 396. The "severity of the crime at issue" must be taken into account. Id. A court must also ask "whether the suspect poses an immediate threat to the safety of the officer or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Id.; see also Oliver v. Fiorino, 586 F.3d 898, 905 (11th Cir. 2009). The ultimate question is "whether the totality of the circumstances justifie[s] a particular sort of … seizure." Tennessee v. Garner, 471 U.S. 1, 8–9 (1985).

Under this standard, Fries acted reasonably in shooting Peterson. Although Peterson was suspected of having broken the front window of the Best Little Store in Georgia, the primary crime at issue in this case was the felony of aggravated assault, which supports a heightened use of force. Prior to the shooting, Peterson had assaulted, in an aggravated manner, both McKnight and Fries. In Georgia, "a person commits the offense of simple assault when he …

either (1) [a]ttempts to commit a violent injury to the person of another; or (2) [c]ommits an act which places another in reasonable apprehension of immediately receiving a violent injury." O.C.G.A. § 16-5-20(a). "A person commits the offense of aggravated assault when he … assaults … [w]ith a deadly weapon or with any device … which … is likely to or actually does result in serious bodily injury." O.C.G.A. § 16-5-21(b).

The undisputed factual record shows that Peterson committed aggravated assault on McKnight when the officer went to the house to question Peterson about the broken window.[13] McKnight heard Peterson cursing from inside the house after the suspect slammed the back door in the officer's face. When McKnight returned to the front door and began knocking, Peterson ran to the door and opened it, while holding the knife in his right hand, in a manner that was very aggressive and caused McKnight to feel threatened.[14] Peterson's behavior

---

[13] Chief Lang's deposition testimony that merely appearing in a doorway with a knife in one's hand would not constitute assault does not adequately dispute this fact. Chief Lang was answering an abstract question posed by Plaintiff's counsel, one shorn of the contextual details involved in McKnight's and Fries's interactions with Peterson. The chief clearly testified that he believes that Peterson assaulted both McKnight and Fries. In any event, Chief Lang is not a legal expert.

[14] In her amended complaint, Plaintiff alleges that McKnight "reported that Peterson lunged at him with [a] butcher knife." (First Amended Complaint, ¶17). Even though Plaintiff now moves to amend her complaint and, among other things, alter this description, the Court denies this motion for the reasons stated below. Thus, the Court may properly consider this allegation in Plaintiff's pleading to be a judicially admitted fact. See Cooper v. Meridian Yachts, Ltd., 575 F.3d 1151, 1177–78 (11th Cir. 2009). However, the record more than establishes Peterson's commission of the crime of aggravated assault even without this admission.

caused McKnight to feel the need to retreat from the door and draw his firearm. See Petro v. State, 327 Ga. App. 254, 257 (2014) (looking to evidence that a victim had fled in fear from the knife-wielding defendant in affirming an aggravated assault conviction).

Peterson also committed an aggravated assault on Fries. Plaintiff seeks to, but does not, create a genuine factual dispute on this point. Fries has testified that when he opened the interior door into the bedroom in Peterson's house the suspect was "right there," only two to three feet away from the officer. (Deposition of Eric Fries, Doc. 69, p. 63; Affidavit of Eric Fries, Doc. 93, p. 4). Peterson was holding a knife in his right hand and stabbing downward with the knife. Fries stepped backwards, pulled his firearm, and fired three times. Two members of the SWAT team who were standing immediately behind Fries have provided affidavits corroborating these details.[15]

Plaintiff has not provided any evidence that contradicts the testimony from the SWAT team members that Peterson assaulted Fries. Bostick, Plaintiff notes, did not confirm the details of Fries's account of the shooting, but Bostick's position prevented him from fully seeing what was happening. (Deposition of Shawn Bostick, Doc. 107, pp. 65–67). Expert testimony does not create a genuine factual dispute either. Burton, Plaintiff's forensic pathologist, opines that

---

[15] These officers are Mark Williams and Chris Robinson. (See Affidavit of Mark Williams, Doc. 83; Affidavit of Chris Robinson, Doc. 84).

Peterson could have been on the floor when he was shot. However, another possible position involved Peterson's leaning in with his right shoulder and facing Fries, which would accord with the SWAT team's description of the shooting.[16] (Burton Depo., pp. 29–30). Burton also testified that Peterson was no closer than three to five feet from Fries when the gun was shot. This evidence does not conflict with Fries's account because the officer testified that he stepped away from Peterson as he was firing.[17] Finally, Plaintiff focuses on the fact that the blood drops from Peterson closest to where Fries shot him were approximately twenty-four feet away from where the shooting occurred. (Affidavit of Audwyne Belcher, Doc. 110). Plaintiff urges the Court to interpret this fact as indicating that Peterson was not shot at the rear of the house, but there are no grounds for doing so. There is no expert testimony—and this is the sort of inference that would require expert testimony—stating that a person with Peterson's body type who received the gunshot wound he sustained would begin producing blood drops within twenty-four feet of where the shooting happened. Thus, the location of the blood drops does not contradict Defendants' account. In sum, to contradict

---

[16] Perhaps more to the point, Burton was describing the arrangement of Peterson's body and Fries's firearm when the bullet was shot, which does not contradict Fries's testimony about what Peterson was doing in the preceding seconds. Burton said nothing about whether Peterson was stabbing with a knife *before* Fries shot his gun.

[17] Even if Peterson had been more than five feet away when Fries first saw him, the officer would still have been in reasonable fear of imminent injury. See Robinson v. Arrugueta, 415 F.3d 1252, 1256 (11th Cir. 2005) (noting that an officer's use of lethal force was lawful because he was only approximately three seconds away from getting injured by a vehicle whose driver the officer shot).

the sworn testimony provided by Defendants, Plaintiff offers only possible factual scenarios based on a "scintilla of evidence" from which the Court would have to make inferences to create factual disputes.[18] This is insufficient to meet her burden at the summary judgment stage. See Garczynski v. Bradshaw, 573 F.3d 1158, 1168–69 (11th Cir. 2009); Daniels v. Twin Oaks Nursing Home, 692 F.2d 1321, 1324 (11th Cir. 1982) (noting that "an inference is not reasonable if it is only a guess or a possibility, for such an inference is not based on the evidence but is pure conjecture and speculation") (internal citation and quotation omitted); see also Rodriguez v. Farrell, 280 F.3d 1341, 1353 n. 20 (11th Cir. 2002).

The second factor also weighs in Fries's favor because Peterson posed an immediate threat to him. When Fries first encountered Peterson, the suspect was within a few feet of him and wielding a knife. Knowing that Peterson had assaulted McKnight with a knife earlier in the day, Fries was reasonable in thinking that he faced an immediate threat of serious injury or death when confronted by Peterson.

The third factor, relating to whether Peterson resisted arrest or attempted to evade arrest by flight, also lies in Fries's favor. Not only was Peterson resisting arrest in the moment that Fries shot him, he had been resisting arrest for several

---

[18] The weakness of Plaintiff's argument is highlighted by the fact that she makes no contention for where Peterson and Fries actually were when the shooting happened. She evidently assumes she has created a factual dispute merely by gathering possible scenarios. She is wrong.

hours before then. Peterson actively resisted law enforcement's investigation into his conduct throughout the course of that morning, beginning with his assault on McKnight when the officer sought to question him about the broken window. Taking the various factors enumerated in Graham v. Connors into account, and balancing Peterson's constitutional interests with the governmental interests, the Court finds that Fries did not violate Peterson's Fourth Amendment rights.

### ii.        Whether Fries is protected by qualified immunity

Even if Fries had violated the Fourth Amendment, he is protected by qualified immunity from the § 1983 claim against him in his individual capacity. "Qualified immunity offers complete protection for government officials sued in their individual capacities as long as their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known." Lee v. Ferraro, 284 F.3d 1188, 1193–94 (11th Cir. 2002) (internal citation and quotation omitted). To obtain the protection afforded by qualified immunity a defendant must first show that he was "engaged in a discretionary duty." Mercado v. City of Orlando, 407 F.3d 1152, 1156 (11th Cir. 2005). A discretionary duty is one that is "of a type that [falls] within the employee's job responsibilities." Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1265 (11th Cir. 2004). In analyzing a particular duty, the court must "ask whether the government employee was (a) performing a legitimate job-related function (that

is, pursuing a job-related goal), (b) through means that were within his power to utilize." Id.

If a defendant's actions were done in a discretionary capacity, then the burden shifts to the plaintiff to show that the actions violated a constitutional right that "was clearly established at the time of the incident." Mercado, 407 F.3d at 1156. "The inquiry into whether a right is clearly established 'must be undertaken in the light of the specific context of the case, not as a broad general proposition.'" Hoyt v. Cooks, 679 F.3d 972, 977 (11th Cir. 2012) (quoting Coffin v. Brandau, 642 F.3d 999, 1013 (11th Cir. 2011)). A right could be "clearly established" if "a materially similar case has already been decided, giving notice to the police."[19] Mercado, 407 F.3d at 1156. "[I]f case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant." Hoyt, 672 F.3d at 977 (quoting Priester v. City of Riviera Beach, 208 F.3d 919, 926 (11th Cir. 2000)).

There is a "narrow exception … to the rule requiring particularized case law to establish clearly the law in excessive force cases." Priester, 208 F.3d at 926. Under this exception, an official would not be entitled to qualified immunity if his "conduct 'was so far beyond the hazy border between excessive and acceptable force that [he] had to know he was violating the Constitution even

---

[19] This Court is required to consider case law from the Supreme Court, the Eleventh Circuit, and the relevant state's highest court. Hoyt, 672 F.3d at 977.

without caselaw on point.'" Id. (quoting Smith v. Mattox, 127 F.3d 1416, 1419 (11th Cir. 1997)). The exception only applies if every reasonable officer in the defendant's position would conclude that the force was unlawful. Id. at 926–27.

Plaintiff contends that Fries's use of deadly force against Peterson was not discretionary,[20] but she is mistaken. An officer engaged in effecting the arrest of a suspect, like Fries, is authorized to use force, even lethal force, against the suspect if that person's resistance to the arrest places the officer's life in danger. See generally Robinson v. Arrugueta, 415 F.3d 1252, 1256 (11th Cir. 2005) (finding an officer who used lethal force when effecting an arrest to be entitled to qualified immunity, necessarily including a finding that the use of force was a discretionary action). Thus, Fries performed a discretionary function in shooting Peterson because he was a peace officer engaged in a law enforcement activity, and the suspect was a few steps from him, wielding a knife in a threatening manner.[21]

Plaintiff must now show that shooting Peterson violated a clearly-established constitutional right. She has not done so. First, the Court has already concluded that Fries did not violate Peterson's Fourth Amendment rights.

---

[20] Plaintiff concedes that Fries's entering the house was a discretionary function.

[21] While Sean Ladson did tell Fries to use non-lethal force, this order was conditioned on a scenario in which Peterson would come running out the back door of the house and Ladson would be ready to use lethal force if necessary. Furthermore, some period of time passed between this order and Bostick's command for Fries to *enter* the house. (Deposition of Sean Ladson, Doc. 108, pp. 32–33, 50–51).

Second, even if there had been a violation, this right was not clearly established at the time of the shooting. Plaintiff has not pointed to, and the Court is not aware of, any materially similar case that would have put Fries on notice that his actions violated the Constitution. Plaintiff argues that general principles of Fourth Amendment jurisprudence should have put Fries on notice that his actions violated the Constitution. However, the Eleventh Circuit has repeatedly held that "it is … constitutionally reasonable for an officer to use deadly force when he has probable cause to believe that his own life is in peril." Arrugueta, 415 F.3d at 1256 (finding an officer was protected by qualified immunity for shooting a man who was driving a vehicle toward the officer in a threatening manner); see also Penley v. Eslinger, 605 F.3d 843, 854 (11th Cir. 2010). Because the shooting did not violate Peterson's clearly-established constitutional rights, Fries is entitled to qualified immunity.

### b.   Plaintiff's § 1983 Claim Against Bostick

Bostick is entitled to summary judgment on this claim because he did not violate Peterson's Fourth Amendment rights. Even if there had been a violation, Bostick would be entitled to summary judgment in his favor because he is protected by qualified immunity.

### i.   Whether Bostick violated the Fourth Amendment by how he supervised Fries

Plaintiff alleges that Bostick violated Peterson's rights in two ways: first, by the manner in which he supervised Fries and, second, by the order to tase Peterson after the suspect had been shot.[22] Both assertions are meritless.[23]

According to Plaintiff, as the SWAT team leader Bostick had the responsibility for ensuring that its members were adequately trained and is therefore liable under § 1983 for Fries's lack of training in how to "apprehend[ ] suspects barricaded inside their homes."[24] (Plaintiff's Brief in Opposition to

---

[22] In her pleadings, Plaintiff also alleged that Bostick violated Peterson's rights when he "escalated the situation by instructing the [SWAT] team to pull the meter box, instructing officers to yell at Peterson through a bullhorn, and by instructing … Fries to breach the back door despite having no contingency plan on how to avoid the use of deadly force if Peterson confronted … Fries with a weapon." (First Amended Complaint, ¶57). However, Plaintiff does not elaborate on this allegation in her brief opposing Bostick and Whittington's motion for summary judgment. Thus, to the extent she intended it to function as a separate claim, the Court must assume that she has abandoned the claim and grants summary judgment on it. See Resolution Trust Corp. v. Dunmar, 43 F.3d 587, 599 (11th Cir. 1995). Even if Plaintiff had argued the claim, the Court does not believe the alleged actions violated the Fourth Amendment.

[23] The Court declines to consider Plaintiff's argument that Bostick lacked a valid arrest warrant for Peterson and therefore violated the Fourth Amendment by ordering the SWAT team to enter Peterson's house. This claim is not in the amended complaint, and the Court denies Plaintiff's motion to amend her complaint, for the reasons given below.

[24] Plaintiff makes this same argument for the supervisory liability of Chief Lang, Sheriff Whittington, and the City of Moultrie with regard to both Fries's and Bostick's actions. In her amended complaint, Plaintiff also alleges that Bostick, Chief Lang, Sheriff Whittington, and the City of Moultrie have supervisory liability under § 1983 because neither the CCSD nor the MPD conducted internal investigations or disciplinary proceedings against officers after Peterson's death, which Plaintiff alleges meant that the supervisory Defendants ratified the Fourth Amendment violations. (First Amended Complaint, ¶81). Plaintiff has abandoned this allegation because she did not renew the

Bostick and Whittington's Motion for Summary Judgment, Doc. 112-1, p. 16). The Eleventh Circuit has consistently held "that § 1983 claims may not be brought against supervisory officials on the basis of vicarious liability or *respondeat superior*." Keating v. City of Miami, 598 F.3d 753, 762 (11th Cir. 2010). Section 1983 only provides for supervisory liability "either when the supervisor personally participates in the alleged unconstitutional violation or when there is a causal connection between actions of the supervising official and the alleged constitutional violation." Id. (quoting Gonzalez v. Reno, 325 F.3d 1228, 1234 (11th Cir. 2003)). A causal connection could be established by "a history of widespread abuse" giving the supervisor "notice of the need to correct the alleged deprivation, and he fails to do so"; if he had a policy or custom that led to a "deliberate indifference to constitutional rights"; or there are facts allowing for an inference that he "directed his subordinates to act unlawfully or knew" they would and "failed to stop them from doing so." Gonzalez, 325 F.3d at 1234–35 (internal citations and quotations omitted). The standard for establishing supervisory liability is "extremely rigorous." Id. at 1234 (internal citation and quotation omitted).

In his role as a supervisor of the SWAT team, Bostick did not violate Peterson's constitutional rights. The Court has already held that Fries did not use

---

contention in her briefs opposing summary judgment nor point the Court to evidence supporting it.

excessive force on Peterson. Even if there were facts indicating that the force was excessive, Bostick would still not be liable under § 1983. Plaintiff has not pointed the Court to evidence indicating that Bostick ordered Fries to carry out an action that violated the Fourth Amendment, knew or should have known the SWAT team had a history of using excessive force, or knew the team members would violate Peterson's rights and failed to stop them from doing so.[25] Plaintiff contents herself with arguing that the need for the SWAT team to be trained in how to apprehend barricaded suspects was "obvious," even if there are no other examples of the SWAT team using excessive force in such situations. She is incorrect. The Eleventh Circuit has noted that "the Supreme Court has given only a hypothetical example of a need to train being 'so obvious' without prior constitutional violations: the use of deadly force where firearms are provided to police officers." Gold v. City of Miami, 151 F.3d 1346, 1352 (11th Cir. 1998) (citing City of Canton v. Harris, 489 U.S. 378, 390 n. 10)). The Court finds that, in the abstract, apprehending suspects who are barricaded inside their homes is not the sort of law enforcement activity that, without training, will inevitably or obviously lead to Fourth Amendment violations.

---

[25] The Court will separately address the claim that ordering Plaintiff to be tased was a violation of the Fourth Amendment.

### ii.   Whether Bostick violated the Fourth Amendment by ordering Peterson to be tased

The Court also rejects Plaintiff's claim that Bostick violated Peterson's Fourth Amendment rights by ordering him to be tased twice after the suspect had been shot by Fries. When the SWAT team re-entered Peterson's house after the shooting and discovered the suspect in the front room, they were faced with a situation which, considering the three factors provided by the Supreme Court in Graham v. Connors, permitted the use of force Bostick authorized. Peterson had just assaulted Fries with a knife and had earlier committed the same crime against McKnight. Bostick also reasonably perceived Peterson as continuing to pose a threat to the SWAT team because the officer was told the suspect still had the knife and did not realize that the suspect was wounded. Moreover, Peterson appeared to be resisting arrest. When told to show his hands, he began to get up from the ground rather than complying with the order. The Eleventh Circuit has repeatedly held that a limited use of force on a suspect who is resisting arrest is appropriate, particularly if the officer could reasonably believe the suspect posed an imminent threat. See, e.g., Penley, 605 F.3d at 853; Garczynski, 573 F.3d at 1168–69.

### iii.   Whether Bostick is shielded by qualified immunity

Even if Bostick had violated Peterson's constitutional rights, the SWAT team leader would be entitled to qualified immunity with respect to Plaintiff's

claims. Plaintiff does not dispute that Bostick was exercising his discretionary authority as a law enforcement officer when he supervised the SWAT team and ordered Peterson to be tased. The Court has already found that Bostick did not violate Peterson's Fourth Amendment rights. Even if there were a factual dispute on whether a violation had occurred, Plaintiff has not shown that such a right was clearly established at the time the events of this lawsuit happened.

First, it was not clearly established that failing to train the SWAT team in how to apprehend barricaded suspects violated the Constitution. The Court is not aware of any factually-similar case that would have put Bostick on notice that failing to provide the SWAT team with such training was a constitutional violation. Moreover, neglecting to train the SWAT team for these situations does not lie "so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to [Bostick], notwithstanding the lack of caselaw." Smith, 127 F.3d at 1419.

Second, Plaintiff has failed to show how it violated clearly-established law for Bostick to order Peterson to be tased. The Court is not aware of any case with materially similar facts that would have served as established precedent and provided a bright line rule that Bostick's conduct violated the Fourth Amendment. See Hoyt, 672 F.3d at 977–78. Moreover, given that Peterson had assaulted other officers with a knife earlier in the day, steadfastly resisted arrest, and had

refused to communicate throughout the stand-off, the Court is not prepared to say that every reasonable officer in Bostick's position would have known it was unconstitutional to tase Peterson twice when he would not show his hands, still had the knife, and appeared to be getting up. See id. at 978.

### c.   Plaintiff's § 1983 Claim Against Whittington

Summary judgment is granted on this claim because Sheriff Al Whittington did not violate Peterson's Fourth Amendment rights and, even if he had, he is entitled to qualified immunity. Plaintiff alleges that Whittington has § 1983 liability as a SWAT team supervisor for the violations supposedly committed by Fries and Bostick. The Court has already found that these officers did not violate Peterson's Fourth Amendment rights. Even if they had, there is no basis for holding Whittington liable as a supervisor for any violations that occurred. The sheriff was not involved as either a direct participant or a supervisor in the events that took place at Peterson's house. His only connection to this case, and it is a tangential one, derives from the fact that the SWAT team is partly composed of sheriff deputies from the CCSD. However, the SWAT team did not have a history of using excessive force, much less against barricaded suspects specifically, that would have given Whittington notice his deputies needed additional training. Furthermore, as the Court observed with regard to Bostick, training in how to apprehend a barricaded suspect is not such an obvious need as to justify

supervisory liability on its absence alone. See Gold, 151 F.3d at 1352. Because Whittington did not violate the Fourth Amendment as a supervisor, he is entitled to qualified immunity.[26]

### d.   Plaintiff's § 1983 Claim Against Lang

Chief Frank Lang is entitled to summary judgment on this claim because he did not violate the Fourth Amendment and, insofar as the individual-capacity claim against him is concerned, he is entitled to qualified immunity.[27] Plaintiff's claim is that Chief Lang was responsible for ensuring that the SWAT team was properly trained, should have known that the team members did not have adequate training for how to apprehend suspects barricaded inside their homes, and therefore has supervisory liability under § 1983 for the shooting and tasering of Peterson. The Court has addressed, above, with regard to Bostick and Sheriff Whittington why this claim is meritless. As alleged supervisors of the SWAT team, Chief Lang's, Sheriff Whittington's, and Bostick's roles were similar, so the Court need not repeat the preceding reasoning and analysis here for the police

---

[26] When the events at issue in this case occurred, there was also no clearly-established law providing notice to Whittington that his manner of supervising and training the SWAT team violated the Constitution.

[27] The official-capacity claim against Lang relates to his being the chief of the MPD, i.e., a municipal employee of the City of Moultrie. Thus, in effect, this claim is against Moultrie because the city would be responsible for any damages Plaintiff received from the claim. Given that the city has been separately named as a defendant with respect to Lang's supervision and training of Fries, the official-capacity claim against Lang is dismissed as redundant. See Busby v. City of Orlando, 931 F.2d 764, 775 (11th Cir. 1991) (citing Kentucky v. Graham, 473 U.S. 159, 156 (1985)); Moon v. Brown, 939 F. Supp. 2d 1329, 1353 (M.D. Ga. 2013).

chief. Suffice to say, Chief Lang is not liable under § 1983 in either his official or individual capacity, and, in any case, he would be protected by qualified immunity in his individual capacity.[28]

### e.   Plaintiff's § 1983 Claim Against the City of Moultrie

There is no basis for holding the City of Moultrie liable under § 1983. From her pleadings and brief in opposition to the Moultrie Defendants' motion for summary judgment, Plaintiff seems to be stating a supervisory liability claim under § 1983 against Moultrie. "[A] municipality can be found liable under § 1983 only where the municipality *itself* causes the constitutional violation at issue. *Respondeat superior* or vicarious liability will not attach under § 1983." Harris, 489 U.S. at 385 (emphasis in original). "[T]here are only 'limited circumstances' in which an allegation of a failure to train or supervise can be the basis for liability under § 1983." Gold, 151 F.3d at 1350 (quoting Harris, 489 U.S. at 387). In the absence of "an express written or oral municipal policy of inadequately training or supervising" employees, "a plaintiff may prove a city policy by showing that the

---

[28] Plaintiff focuses the supervisory liability argument in her brief opposing the Moultrie Defendants' motion for summary judgment on the need for the SWAT team to be trained in how to apprehend barricaded suspects. In her amended complaint, she also based the supervisory liability claim on a supposed history of excessive force being used against mentally-ill individuals. (First Amended Complaint, ¶¶69–74). Plaintiff appears to have abandoned this claim, but in any event the argument fails to establish supervisory liability under § 1983. Although there is some evidence that MPD officers killed two other mentally-ill individuals before Peterson's death, there is no evidence that the earlier deaths were factually similar to the shooting here or that they even involved Fourth Amendment violations. See Gold, 151 F.3d at 1351 (citing cases).

municipality's failure to train evidenced a 'deliberate indifference' to the rights of its inhabitants." Id. at 1350 (quoting Harris, 489 U.S. at 388). To prove "deliberate indifference," there must be "some evidence that the municipality knew of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take any action." Id. "[W]ithout notice of a need to train or supervise in a particular area, a municipality is not liable as a matter of law for any failure to train and supervise." Id. at 1351.

The City of Moultrie is granted summary judgment on the § 1983 claim. The record reveals no evidence indicating that the city was deliberately indifferent to a need to have the SWAT team trained in how to apprehend suspects barricaded inside buildings or that Chief Lang, in his role as a supervisor, violated the Fourth Amendment. There is no history of factually-similar incidents involving Fourth Amendment violations, and, in the absence of comparable events, the Court cannot say that the lack of such training would obviously lead to excessive force by law enforcement. See id. at 1352.

## C.    Claims under Georgia Law

Because summary judgment has been granted on Plaintiff's § 1983 claims, her only remaining causes of action are those brought under Georgia law. Plaintiff has not opposed Bostick and Whittington's motion for summary judgment on the state-law claims or Chief Lang's motion for summary judgment on the

state-law claims against him in his individual capacity. Therefore, she has abandoned these claims, and these Defendants are granted summary judgment.[29] See Resolution Trust Corp. v. Dunmar, 43 F.3d 587, 599 (11th Cir. 1995).

Summary judgment is also granted on the state-law claims against Fries in his individual capacity because he is protected by official immunity. Georgia law affords official or qualified immunity to public officials in their individual capacities from claims under state law so long as the actions made the basis of the lawsuit were discretionary. Middlebrooks v. Bibb County, 261 Ga. App. 382, 385 (2003). "A discretionary act calls for the exercise of personal deliberation and judgment, which in turn entails examining the facts, reaching reasoned conclusions, and acting on them in a way not specifically directed." Id. (quoting Clark v. Prison Health Servs., Inc., 257 Ga. App. 787, 792 (2002)). "The operation of a police department, including the degree of training and supervision to be provided to its officers, is a discretionary governmental function…." Carter v. Glenn, 249 Ga.

---

[29] The Court chooses, in its discretion, to continue exercising supplemental jurisdiction over Plaintiff's claims under Georgia law, despite the dismissal of the § 1983 claims, which formed the original basis for this Court's subject-matter jurisdiction. See 28 U.S.C. § 1367(a) and (c); see also Penley, 605 F.3d at 855–56 (affirming the trial court's order granting summary judgment on claims under Florida law after the court had dismissed the federal-law claims). Plaintiff's claims do not raise "novel or complex issue[s] of State law," 28 U.S.C. § 1367(c)(1), and exercising supplemental jurisdiction would favor judicial economy, fairness, and convenience to the parties without harming comity with Georgia courts. See Baggett v. First Nat. Bank of Gainesville, 117 F.3d 1342, 1353 (11th Cir. 1997).

App. 414, 417 (2001) (quoting <u>Lowe v. Jones County</u>, 231 Ga. App. 372, 373 (1998)). A government official is liable for a discretionary act only if was done "with willfulness, malice or corruption." <u>Middlebrooks</u>, 261 Ga. App. at 386 (quoting <u>Carter</u>, 249 Ga. App. at 417).

Fries is entitled to official immunity because the shooting of Peterson was discretionary, and there is no evidence that it was done with willfulness or malice. Fries had not been told precisely how he was to respond should Peterson accost him upon entering the house.[30] When suddenly confronted by the knife-wielding suspect, Fries had to quickly examine the situation and devise an appropriate course of action. His response to the situation is the very definition of a discretionary act. <u>See</u> <u>Cameron v. Lang</u>, 274 Ga. 122, 125 (2001) (noting that the Supreme Court of Georgia has "held that a law enforcement officer exercises discretion in … firing a gun at a suspect"); <u>Williams v. Boehrer</u>, 530 F. App'x 891, 896–97 (11th Cir. 2013). Consequently Plaintiff is required to show that Fries shot Peterson in willfulness or malice, and she has not done so. There is no evidence that the shooting, which was manifestly in self-defense, was "marked by either hatred or ill will or by such utter recklessness and disregard for the rights of [Peterson] as denotes a corrupt or malevolent disposition." <u>Harvey v.</u>

---

[30] Plaintiff maintains that Officer Ladson's instructions for Fries not to use lethal force create a question of fact for whether shooting Peterson was a discretionary or ministerial act. As discussed above, these instructions were given well before Fries was told to enter the house and anticipated a different set of circumstances than Fries ultimately faced.

Nichols, 260 Ga. App. 187, 192 (2003) (quoting Partain v. Maddox, 131 Ga. App. 778, 784 (1974)).

Finally, summary judgment is granted on the official-capacity claims against Lang and Fries and the claims against the City of Moultrie because all of these claims are barred by sovereign immunity.[31] "The doctrine of sovereign immunity … protects all levels of government from legal action unless they have waived their immunity from suit." Cameron, 274 Ga. at 126. The doctrine extends to public employees sued in their official capacities, for such suits are really suits against the governmental entity which employs them. Id. A municipality may waive its sovereign immunity to the extent it purchases liability insurance that would cover the circumstances made the basis of the lawsuit at issue. Wendelken v. JENK LLC, 291 Ga. App. 30, 32 (2008).

The City of Moultrie has not introduced evidence that it lacked a liability insurance policy at the time of Peterson's death, but then it is not required to do so to enjoy the protection of sovereign immunity. "Sovereign immunity is not an affirmative defense that must be established by the party seeking its protection. Instead, immunity from suit is a privilege and the waiver must be established by the party seeking to benefit from the waiver." Gilbert v. City of Jackson, 287 Ga.

---

[31] While the Moultrie Defendants' brief in support of the motion for summary judgment does not explicitly refer to "sovereign immunity," there is no doubt that their motion for summary judgment was "meant to address each and every claim made by Plaintiff," (Doc. 89, p. 1), and they raised the defense of sovereign immunity in their answer to the amended complaint. (See Doc. 36, "Eighth Defense," p. 3).

App. 326, 327 (2007) (quoting <u>Fulton-DeKalb Hosp. Auth. v. Walker</u>, 216 Ga. App. 786, 788 (1995)). The holding in <u>Wendelken v. JENK</u> is instructive. There, the Georgia Court of Appeals held that the City of Rincon was protected from suit by sovereign immunity even though the city had not offered evidence it lacked a relevant liability insurance policy. <u>Wendelken</u>, 291 Ga. App. at 32–33. The appellate court reasoned that it was the plaintiffs' affirmative obligation to introduce into the trial record evidence such a policy existed, which they had not done. <u>Id.</u> So too the City of Moultrie, Lang, and Fries are shielded by sovereign immunity because Plaintiff has not provided evidence the city waived its immunity by a pertinent insurance policy or otherwise.

## IV.    Plaintiff's Motion for Leave to Amend

Plaintiff's motion for leave to amend the complaint is denied. Plaintiff seeks to correct what she contends is an erroneous factual allegation in the complaint and to add a claim for unlawful arrest. Plaintiff did not move for leave to amend the complaint until February 24, 2015. The deadline for the parties to amend their pleadings was November 20, 2014, with the time to conduct fact discovery ending on December 24, 2014.[32] Moreover, by the time Plaintiff asked for leave to amend her complaint, the Defendants had filed their motions for summary

---

[32] The Defendants moved for, and the Court granted, leave to take the deposition of one of Plaintiff's experts outside the discovery period, but the order granting this leave expressly stated that no other deadlines were extended by that order. (Order, Doc. 58).

judgment on February 2 and February 3, 2015, respectively, for February 3 was the deadline for filing dispositive motions. (Order, Doc. 57).

"A plaintiff seeking leave to amend its complaint after the deadline designated in a scheduling order must demonstrate 'good cause' under Fed.R.Civ.P. 16(b)." S. Grouts & Mortars, Inc. v. 3M Co., 575 F.3d 1235, 1241 (11th Cir. 2009) (citing Sosa v. Airprint Sys., 133 F.3d 1417, 1418 n. 2 (11th Cir. 1998)). This "good cause standard precludes modification of the scheduling order unless the schedule cannot be met despite the diligence of the party seeking the extension." Oravec v. Sunny Isles Luxury Ventures, L.C., 527 F.3d 1218, 1232 (11th Cir. 2008) (internal citation, quotation, and punctuation omitted). The Eleventh Circuit's opinion in Southern Grouts & Mortars is on point. In that case, the plaintiff had known of the information it wished to add to its complaint for over a month before it moved for leave to amend. Nevertheless, the plaintiff did not move to amend its complaint until after the deadline for doing so had passed by five months, fact discovery had ended, and the parties had already filed their initial briefs in support of summary judgment. Consequently, the Eleventh Circuit concluded that the plaintiff had not acted with diligence and therefore could not show the good cause required by Rule 16. S. Grouts & Mortars, 575 F.3d at 1241–43.

Here, Plaintiff has not shown good cause for allowing her to amend her complaint past the deadline set by the scheduling order. Plaintiff asserts that she did not learn of the facts supporting the proposed amendment to the complaint until the deposition of Lamar McKnight, an officer with the MPD, was taken. However, this deposition took place on November 19, 2014. Assuming, without finding, that prior to McKnight's deposition Plaintiff acted diligently to uncover the information she would like to add to her complaint, the Court finds that she was certainly not diligent after that point. She could have sought to amend her complaint within the time set by the Court, while discovery was still open, or at least before Defendants spent considerable time preparing and filing their initial briefs in support of summary judgment. She chose not to do so. Therefore, her motion is denied. See Lowe's Home Ctrs., Inc. v. Olin Corp., 313 F.3d 1307, 1315 (11th Cir. 2002) ("[I]t is not an abuse of discretion for a district court to deny a motion for leave to amend following the close of discovery, past the deadline for amendments, and past the deadline for filing dispositive motions.").

## V.   Conclusion

Based on the foregoing, the Court orders the following:

1.   The Moultrie Defendants' Motion to Exclude Plaintiff's Expert Joseph Burton's Opinions (Doc. 60) is granted in part and denied in part;

2.     Defendants Bostick and Whittington's Motion to Exclude Plaintiff's Expert Joseph Burton (Doc. 61) is granted in part and denied in part;

3.     Defendants Bostick and Whittington's Motion for Summary Judgment (Doc. 85) is granted;

4.     The Moultrie Defendants' Motion for Summary Judgment (Doc. 90) is granted;

5.     Plaintiff's Motion for Leave to Amend the Complaint (Doc. 115) is denied; and

6.     This case is dismissed with prejudice.


**SO ORDERED**, this the 15th day of June, 2015.


*s/ Hugh Lawson*_____
**HUGH LAWSON, SENIOR JUDGE**

scr